## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

_____

VIETNAM VETERANS OF AMERICA,
CONNECTICUT STATE COUNCIL OF
VIETNAM VETERANS OF AMERICA,
and ANTHONY D. MALONI,                                    Civil Action No. _____

           Plaintiffs,                                                COMPLAINT

      v.

DEPARTMENT OF DEFENSE,

           Defendant.
_____

## **INTRODUCTION**

In the days following January 17, 1966, the U.S. Air Force ("USAF") sent Anthony Maloni and 1,600 of his fellow airmen to Palomares, Spain, to clean up one of the largest nuclear accidents in history. Near Palomares, a USAF B-52 bomber collided with a USAF KC-135 tanker aircraft, causing four hydrogen bombs to fall out of the B-52. Two broke open, releasing clouds of radioactive plutonium dust over the Spanish countryside. Plaintiff Maloni and his fellow airmen spent weeks to months exposed to those radioactive particles as they participated in the cleanup operation. They scoured fields for wreckage, destroyed crops, and shoveled contaminated soil while wearing only thin surgical masks for protection, or nothing at all. The USAF fed the airmen local produce, had them drink local water, and housed them in tents on the beach within sight of an impact crater from one of the bombs. It did not provide the airmen with adequate protection or warn them of the dangers inherent in their assignment.

Many of the airmen that participated in the USAF cleanup operation have suffered debilitating health effects that stem from their exposure to radiation at Palomares, including

various forms of cancer, blood disorders, heart and lung dysfunction, and other sicknesses. Yet, for over fifty years the government has refused to recognize the Palomares cleanup as a radiation risk event. As a result, the U.S. Department of Veterans Affairs ("VA") has systematically denied disability benefits for Palomares-connected conditions.

Although it conducted urine sampling on hundreds of responders at Palomares, the Department of Defense ("DoD") never shared the results of that urinalysis with the majority of those veterans. Indeed, some veterans who applied for disability benefits for Palomares-connected conditions have been told that there is no record of their presence at the site at all. Even for those whose urinalysis results have been identified, the DoD maintains that estimated radiation doses for the overwhelming majority of Palomares veterans are too low to have triggered radiogenic diseases. However, DoD's current methodology is inadequate, a shortcoming admitted to by the very report that the methodology is drawn from.

Among the airmen whose service-connected claims have been rejected is Plaintiff Maloni. Like many veterans of Palomares, Mr. Maloni suffers the effects of radiation exposure but has been denied disability benefits by the VA. Mr. Maloni requested DoD records relevant to his claim pursuant to the Freedom of Information Act ("FOIA"). In violation of FOIA, Defendant DoD has failed to provide timely, adequate responses to Mr. Maloni's requests.

Plaintiffs Vietnam Veterans of America ("VVA") and the Connecticut State Council of Vietnam Veterans of America ("VVA-CT") have also requested DoD records related to the Palomares accident on behalf of former airmen who—like Mr. Maloni—were exposed to radiation during the Palomares cleanup operation. DoD has failed to respond to VVA and VVA-CT's requests. Today, even the youngest Palomares responders are now approaching 70 years old. None can afford further delay.

2

Plaintiffs bring this action under the Freedom of Information Act, 5 U.S.C § 552, to compel DoD to conduct a reasonable search and promptly produce wrongfully withheld records.

## JURISDICTION AND VENUE

1.    This court has jurisdiction over this matter pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 1331 and 1361.

2.    Venue lies in this district under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e)(3) as Plaintiff VVA-CT resides and has its primary place of business in the District of Connecticut and no real property is involved in this action.

## PARTIES

3.    Plaintiff Anthony Maloni is a 72-year-old veteran living in Massachusetts.

4.    Plaintiff VVA is a Congressionally chartered national membership organization that advocates on issues important to veterans, seeks full access to quality health care for veterans, and works to identify the full range of disabling injuries and illnesses incurred during service. It disseminates news and information relevant to veterans of the Vietnam era to its membership and to the general public, and has 635 chapters and 81,680 members nationwide.

5.    Plaintiff VVA-CT is based in East Hartford, Connecticut, and seeks to connect and advocate on behalf of veterans of the Vietnam era who reside in Connecticut.

6.    Defendant United States Department of Defense is the federal agency responsible for coordinating and supervising government activity related to national security and the United States Armed Forces. DoD is an agency within the meaning of 5 U.S.C. § 552(f).

## STATEMENT OF FACTS

7.    On January 17, 1966, a USAF B-52 bomber collided with a USAF KC-135 tanker aircraft, causing four hydrogen bombs to land near Palomares, Spain. Two of the bombs broke

3

open, and released clouds of radioactive plutonium dust over the Spanish countryside.

8.      Following the accident, the USAF ordered approximately 1,600 U.S. airmen to Palomares, Spain to clean up the wreckage from the crash and remove plutonium-contaminated soil and crops in the area.

9.      Plaintiff Anthony D. Maloni, then 21 years old, arrived in the first waves of troops assigned to the cleanup.

10.     The USAF did not adequately inform Mr. Maloni or other airmen of the potential dangers of contact with plutonium dust and radioactive debris, and did not provide any of them with adequate training or safety equipment.

11.     At first, the USAF required Mr. Maloni and fellow airmen to stand shoulder-to-shoulder and slowly walk the fields surrounding the crash site in order to identify and collect debris from the wreckage.

12.     The USAF then ordered Mr. Maloni and others to destroy most of the crops in the area. Service members walked the fields pulling up stakes and cutting through tomato vines with machetes. They dug pits in which crops and vegetation were dissolved with lime or doused in gasoline and burned.

13.     Mr. Maloni recalls vomiting from the thick, acrid smoke emanating from the burning vegetation.

14.     In the final stage of the cleanup, crews bulldozed the earth, sending clouds of plutonium-laced dust into the air. John H. Garman, a 23-year-old military police officer and interpreter, spent weeks in the fields shoveling contaminated soil into barrels with fellow airmen. Eventually, 5,300 of those barrels were transported to the U.S. for secure burial.

15.     With the exception of a thin surgical mask that the airmen were not required to

wear, the USAF did not issue its service members protective clothing or equipment. The Atomic Energy Commission confiscated plutonium-coated clothing from Mr. Garman and some of his fellow airmen who had arrived only a few hours after the crash.

16.     In addition to working long days in the fields without protection, these airmen lived, worked, and relaxed in the area around Palomares for weeks to months at a time, swimming in the ocean and sleeping in tents on the beach within sight of an impact crater. The USAF brought in no clean water, and fed the airmen produce that had been coated with plutonium dust, including tomatoes bought from local farmers at the insistence of the Spanish government.

17.     Non-military personnel were not permitted to enter the areas in which the U.S. airmen worked following the nuclear accident for the duration of the USAF cleanup operation.

### *Dosimetry Methodology*

18.     In the immediate aftermath of the accident and in the months and years that followed, DoD and other U.S. and Spanish agencies conducted environmental and medical testing to measure plutonium contamination levels in the air, ground, and water, as well as in responders' bodies.

19.     Victor B. Skaar, then a 29-year-old medical disaster control technician in the USAF, was a member of the team that collected urine samples from airmen at the site. He recalls that it was impossible to follow proper laboratory protocols in the team's haste to respond to the disaster in difficult field conditions.

20.     For example, while accepted protocol required that the subject provide a second urine sample 12 hours after the first, the team was unable to collect many second samples, and did not collect even a single sample from many airmen.

21.     Some Palomares veterans have succeeded in obtaining the results of their urinalysis. However, DoD has not informed the majority of their results. Moreover, poor protocol adherence means that even those who have received their results cannot be assured of their accuracy.

22.     In 2001, DoD contracted with the litigation consulting firm Labat-Anderson to construct radiation dose estimates for Palomares veterans by "reconciling" the original urinalysis data with environmental data.

23.     The Labat-Anderson report noted that many urine samples showed dangerously high exposure levels, and that some airmen had been exposed to more radiation than others. However, based on external comparisons, the report determined that "these preliminary estimates seem unreasonably high in many cases," and suggested that most Palomares veterans were unlikely to have been exposed to plutonium levels exceeding annual occupational limits.

24.     The 2001 report concluded by stating that "additional effort is needed to reconcile the estimated intakes and doses derived from the urinary bioassay data with the estimates from environmental measurements."

25.     DoD declined to conduct additional analysis.

26.     Despite the 2001 report's admission that additional efforts were needed to account for the high radiation exposure levels indicated in airmen's urine samples, in 2013 the USAF established dose estimate procedures for veterans seeking VA benefits for Palomares-connected disabilities that relied solely on the 2001 report.

27.     Under the 2013 Palomares dose estimate methodology, as before, the overwhelming majority of Palomares veterans are assigned dose estimates too low to qualify them for service-connected disability compensation.

*Palomares Veterans' Health Outcomes*

28.     Prolonged exposure to ionizing radiation from the plutonium at Palomares continues to have an adverse effect on the health of airmen who participated in the cleanup.

29.     After Palomares, Mr. Maloni developed psoriasis, eczema, alopecia, bronchitis, high blood pressure, and ischemic heart disease, and began experiencing excruciating headaches and migraines. He is the only one of his 10 siblings to have experienced any of these health conditions, which have a significant and pervasive negative impact on his life.

30.     Many other Palomares veterans have developed blood disorders and various cancers, and many have died young. Because DoD has not released a list of the airmen it shipped to Palomares, the prevalence of cancer and other radiogenic conditions among Palomares veterans is unknown.

31.     Mr. Skaar has battled leukopenia, skin cancer, and prostate cancer since Palomares.

32.     Mr. Garman was diagnosed with bladder cancer 12 years after Palomares, at the age of 35, as well as with chronic obstructive pulmonary disease, a condition that has slowly deteriorated his lung function and has left him dependent on oxygen tanks today.

33.     Despite the recognition of cancers in particular as presumptively radiogenic conditions under VA regulations, *see* 38 C.F.R. § 3.311, veterans have been unable to access disability benefits for diseases connected to Palomares.

34.     For veterans to receive benefits in connection with a radiogenic disease, they must demonstrate that they participated in a "radiation-risk activity" when serving on active duty. 38 U.S.C. § 1112(c)(3). Yet, the USAF's 1966 cleanup operations at Palomares are not recognized

as a radiation-risk activity.

*FOIA Requests: Plaintiff Anthony Maloni*

35.      Seeking records related to plutonium exposure at Palomares, Mr. Maloni submitted FOIA requests to four different offices within the DoD in March 2017 for records related to his service in the USAF.

36.      Mr. Maloni also sought records related to the Palomares incident more generally, including records of cleanup activities and unit assignments, bioassay data of servicemembers and others at Palomares, environmental testing data, dosimetry methodology, medical or scientific studies and reports, and policies, procedures, and communications related to the scientific and medical response to the incident.

37.      Mr. Maloni submitted identical letters to the FOIA Public Liaison of the Defense Threat Reduction Agency ("DTRA"), the Surgeon General of the Air Force Medical Support Agency ("AFMSA"), the USAF Center for Radiation Dosimetry ("AFCRD"), and Air Force Headquarters ("AFHQ"), all of which are within the DoD. Copies of the requests are attached as Exhibits A-D, respectively.

38.      DoD acknowledged receipt of the FOIA request addressed to DTRA by email on March 7, 2017, and assigned FOIA Case No. 17-036 to the request in a letter postmarked March 28, 2017. The March 28 letter is attached to this complaint as Exhibit E. Neither the March 7 nor the March 28 communication from DTRA constitutes a substantive response to or denial of Mr. Maloni's request.

39.      On or about March 13, 2017, Mr. Maloni's counsel received a voicemail directing that one of Mr. Maloni's FOIA requests be resubmitted to AFHQ.  The voicemail did not clarify whether this direction came from AFMSA or AFRCD. In response, Mr. Maloni resubmitted a

FOIA request to AFHQ dated March 21, 2017 and identical in substance to both the AFMSA and AFRCD requests. AFHQ received and signed for the request on March 23, 2017.

40.     Neither Mr. Maloni nor his counsel has received any further communication from AFMSA, AFRCD, AFHQ, or DTRA.

41.     Upon information and belief, DoD received all FOIA requests by March 23, 2017.

42.     To date, DoD has not provided the records requested by Mr. Maloni, nor provided an adequate response explaining that they would be withheld, notwithstanding FOIA's requirement that an agency respond within twenty working days.

43.     DoD has wrongfully withheld the requested records from Mr. Maloni.

### FOIA Requests: Plaintiffs VVA and VVA-CT

44.     In order to assist Palomares veterans unjustly denied disability compensation, VVA and VVA-CT submitted FOIA requests to the different agencies within DoD on June 13, 2017. Copies of the Requests are attached as Exhibits F-H.

45.     Similar to Mr. Maloni, Plaintiffs VVA and VVA-CT seek records related to the Palomares incident, including records of cleanup activities and unit assignments, bioassay data of service members and others at Palomares, environmental testing data, dosimetry methodology, medical or scientific studies and reports, and policies, procedures, and communications related to the scientific and medical response to the incident.

46.     VVA and VVA-CT submitted letters identical in substances to the letter to the DTRA attached as Exhibit F; to AFCRD, attached as Exhibit G; and to AFHQ, attached as Exhibit H.

47.     Upon information and belief, DoD received all FOIA requests on June 14, 2017.

48.     To date, neither Plaintiffs nor their counsel have received any communication

from DTRA, AFRCD, or AFHQ in response.

49.     DoD has not provided the records requested by VVA and VVA-CT, nor has it provided an adequate response explaining that they would be withheld, notwithstanding FOIA's requirement that an agency respond within twenty (20) working days.

50.     DoD has wrongfully withheld the requested records from VVA and VVA-CT.

## CLAIM FOR RELIEF

51.     Plaintiffs repeat and incorporate every allegation contained in paragraphs 1-50 as if set forth in full.

52.     DoD's failure to notify Plaintiffs within twenty days (excepting Saturdays, Sundays, and legal public holidays) whether it will comply with their requests violated their rights to those records under 5 U.S.C. § 552(a)(6)(A) and 5 U.S.C. § 552(a)(3)(A).

53.     DoD's failure to release responsive, non-exempt records violated Plaintiffs' right to those records under 5 U.S.C. § 552(a)(3)(A).

54.     DoD's failure to make a reasonable search for responsive records violated Plaintiffs' rights under 5 U.S.C. § 552(a)(3)(C).

## REQUESTED RELIEF

WHEREFORE, VVA, VVA-CT, and ANTHONY D. MALONI respectfully request that this Court:

1) Order Defendant to conduct a reasonable search for records responsive to their requests;

2) Order Defendant to disclose and release the requested records in their entireties;

3) Order Defendant to grant a full fee waiver to Plaintiffs;

4) Provide for expeditious proceedings in this action;

5) Award Plaintiffs costs and reasonable attorney's fees in this action as provided by 5

U.S.C. § 552(a)(1)-(2); and

6) Grant any other and further relief the Court deems appropriate.

Dated: October 3, 2017
        New Haven, CT

Respectfully submitted,

By: /s/ Michael J. Wishnie
Jacob Bennett, Law Student Intern*
Meghan Brooks, Law Student Intern*
John Frawley, Law Student Intern*
Marianne Engelman-Lado, Supervising Attorney†
Michael J. Wishnie, Supervising Attorney, ct27221
Jerome N. Frank Legal Services Organization
Veterans Legal Services Clinic
Yale Law School
P.O. Box 209090
New Haven, CT. 06520-9090
Tel: (203) 432-4800
michael.wishnie@ylsclinics.org

*Motion for law student appearance forthcoming
†Motion for pro hac vice forthcoming

Counsel for Plaintiffs